# Pennsylvania Schuylkill Valley Railroad *v.* Philadelphia & Reading Railroad, Appellant.

*Railroads—Crossing of one by another—Equity—Act of June 19, 1871.*

A court of equity will not, under the act of June 19, 1871, P. L. 1361, decree the construction of an overhead crossing, where the cost of such crossing would be so great as to prevent the construction of the railroad.

*Equity—Pleading—Railroads—Municipal consent—Waiver—Act 1871.*

A railroad company filed a bill under the act of June 19, 1871, P. L. 1361, in which they alleged that, "under authority vested in them by law, they have surveyed, ascertained, located, fixed, marked, and determined upon a route crossing defendants' line for two branch railroads." Defendants in their answer averred that they "have no knowledge or information otherwise than from the bill and cannot set forth as to their belief or otherwise as to whether the plaintiffs, under authority vested in them by law, have surveyed, located, fixed, marked and determined upon the routes for a branch railroad as in said paragraph set forth, and, so far as the same are material, the defendants ask that the plaintiff be held to due

proof of the said several allegations." *Held,* that the question as to the right of plaintiffs to cross streets, and whether the consent of the municipality had been obtained for the construction of their branches, was not raised by the pleadings, and was not in the case.

It seems that a railroad company is not required to obtain the consent of the municipality for the construction of its road across streets which are merely plotted, and not actually opened.

It seems that the municipality, by failure to object, may waive the necessity of consent, in any case, at least as far as another railroad is concerned.

Argued March 1, 1894. Appeal, No. 36, Jan. T., 1894, by defendants, from decree of C. P. Berks Co., Sept. T., 1893, No. 512, on bill in equity. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM and DEAN, JJ. Affirmed.

Bill in equity under the act of June 19, 1871, P. L. 1361, to prevent defendants from interfering with construction of a grade crossing by plaintiffs. [For report of injunction in this case to prevent interference with temporary crossing for construction purposes, see 151 Pa. 402.]

Plaintiffs' bill alleged that "under authority vested in them by law, they have surveyed, ascertained, located, fixed, marked and determined upon a route for two branch railroads," crossing defendants' road, to two manufacturing establishments in the. city of Reading. That, in the construction of one branch, it is not reasonably practicable to avoid a grade crossing. That they have submitted to defendants a map or plan of said crossing, and have endeavored to agree with defendants therefor, but have been unable to do so. That defendants object to the making of said grade crossing, and propose forcibly to resist the making of the same, and unless restrained irreparable injury will be done to plaintiffs.

Defendants in their answer declared that they "have no knowledge or information otherwise than from the bill, and cannot set forth as to their belief or otherwise as to whether the plaintiffs, under authority vested in them by law, have surveyed, ascertained, located, fixed, marked and determined upon the routes for a branch railroad as in said paragraph set forth, and, so far as the same are material, the defendants ask that the plaintiffs be held to due proof of the said several allegations."

On replication filed, Harrison Maltzberger, Esq., was appointed examiner and Horace Roland, Esq., master. The latter reported, inter alia, as follows:

"At the point of crossing in question, and for a distance of over a mile in either direction, the main lines of the Schuylkill & Lehigh and the Pennsylvania Schuylkill Valley Railroads parallel each other at a distance apart of only about 21 feet between their nearest rails. The roadbed of the former is about one and one half feet higher than that of the latter. To cross at grade is comparatively easy and cheap. The actual cost of constructing the crossing was about $850, and the entire cost of plaintiff's branch and crossing together is $11,247.50. In order to cross overhead it would be necessary to attain an elevation above the present crossing of about 21 feet clear, or an elevation of about 25 feet to the top of the track on an overhead bridge. The more gradual the ascent to this elevation the greater would be the starting distance from the point of crossing. Your master gathers from the testimony that for the purpose of safe and convenient use with the usual engines and heavy loads, and in all kinds of weather, a greater grade than two feet to the hundred is not advisable. The attainment of this elevation at such a grade would indicate a starting point some twelve hundred feet to the southward, with a gradual approach, swinging to the westward from the line of the plaintiff's road before making such a curve toward the bridge as would be safe and convenient. This approach would close projected streets and would occupy and render substantially useless for any other purpose the land now occupied and owned by the plaintiff company and lying to the west of its tracks to the banks of the Schuylkill river. In anticipation of increased business for both roads in the future, room should be left for the multiplication of tracks, thus necessitating a long and expensive overhead structure. Having reached the eastern side, the descent from the bridge must of needs be almost as gradual as the approach on the western side, while at the same time affecting the topography of the city streets and doing damage to private property as before stated. The expense of this method of crossing in excess of the cost of the present grade crossing, is variously estimated by the witnesses at from about $40,000 to $87,000, irrespective of the damages to the affected property and streets. The variance between these estimates is accounted for in matters affecting the length and breadth, height and depth of the bridge and approaches, and the materials and

character of work in their construction. It is safe to conclude that for a permanent overhead crossing, good and substantial, of sufficient length to permit additional trackage for both roads, with gradual approaches and easy curves, so as to be safely and conveniently used with ordinary engines, including incidental damages to be paid to third parties, an outlay of at least $60,000 would be rendered necessary. The superintendent of the Pennsylvania Schuylkill Valley Railroad Company testifies that, if compelled to cross overhead, in view of the expense and the uncertainty of an adequate return from the enterprise, the company would abandon it, and in this he is sustained by a number of other witnesses. [Under all the facts and circumstances of the case it would not be reasonably practicable to avoid a grade crossing in this case.] " [1]

The master recommended a decree authorizing, under certain restrictions and conditions, the construction of a grade crossing, under the act of June 19, 1871, § 2.

On exceptions to the master's report, the court, in an opinion by ERMENTROUT, P. J., referred the report back to the master to report expressly on the following questions: (1) What restrictions, if any, are placed upon the plaintiffs by the act of April 4, 1868, P. L. 62? (2) Have plaintiffs authority to construct the branch roads set out in plaintiffs' bill? (3) What authority or consent have plaintiffs received, if any, from the city of Reading to occupy the streets mentioned in their proposed route? (4) Can a decree for grade crossing be properly made under the present bill?

The master, in a supplementary report, found as follows:

"1st. Although it does not expressly and affirmatively appear in the examiner's notes of testimony that the plaintiff company is incorporated under the act of April 4, 1868, P. L. 62, and its supplements, the undenied averment to that effect in defendants' answer justifies the conclusion that such is the fact. Appeal of Rowley et al., 115 Pa. 150; Smith v. Ewing, 151 Pa. 256.

"This act provides, inter alia, that any company incorporated under this act shall have authority to construct such branches from its main line as it may deem necessary to increase its business and accommodate the trade and travel of the public. Section 9, page 64.

" Section 10, page 64, provides that companies formed under the provisions of this act shall have the right to construct roads so as to cross at grade the track or tracks of any other railroad in this commonwealth, with provisions following which regulate the payment of the expense of such crossing and the maintenance of signals to prevent accidents.

" Section 11, same page, provides that companies whose roads shall be constructed under the provisions of this act shall have the right to connect their roads with roads of a similar character, etc.

"Section 12, page 65, provides, inter alia, that this act shall not be so construed as to authorize . . . . any corporation formed under this act to enter upon and occupy any street, lane or alley, in any incorporated city of this commonwealth, without the consent of such city having been first obtained.

" 2d. Your master finds from the testimony that the plaintiff did in fact, and he also finds that the plaintiff did under authority vested in it by the general laws pertaining to the construction of railroads, survey, ascertain, locate, fix, mark and determine upon the routes of two branch railroads as set forth in the bill and as manifested by drawings put in evidence and filed; also that the said routes and branches were formally adopted by the board of directors of the plaintiff company by resolution of July 12, 1889, a certified copy of which is in evidence and annexed herewith, and that the said branches have since been constructed. The testimony of the witnesses who were questioned in relation to the subject establishes the fact that these short lines of road are more than mere sidings, and are entitled to be named branches, and that plaintiff company deems them necessary to increase its business and accommodate the trade of the public. At present they would serve no purposes for public travel. The branches are of considerable length and traverse considerable territory, as is apparent from the drafts in evidence. They cross a number of the projected streets of the city of Reading as well as the premises of a number of private owners. Your master does not, therefore, find as a fact as stated in defendants' answer that the said branch 'is located at grade over the property of the Schuylkill & Lehigh Railroad Company, which land has been appropriated and used exclusively by the defendant companies for railroad purposes.' This

statement is in a sense true of the mere crossing, but not of the entire branch or branches. The other matters contained in the bill and answer are either solely matters of law, or your master's previous report has fully stated the facts pertaining thereto.

" 3d. Your master erred in stating in the 5th paragraph of his previous findings of fact, that the streets and alleys in the territory involved in this controversy all remain unopened. Centre avenue, which is crossed by the branch to the National Bolt, Nut & Rivet Works, is an old and much traveled road. Exeter street, also crossed by said branch, is likewise opened and leads from Centre avenue toward the Schuylkill river. The only other opened road or avenue in the vicinity leads from said Centre avenue toward the river, but before reaching plaintiff's branch it abruptly turns southward and thus avoids it. The branch leading to the Reading Foundry Company, Limited, encounters no opened street or avenue. The several railroads occupy and obliterate in this neighborhood what was formerly known as the River road. These conclusions are justified partly from the maps in evidence and the examiner's notes, and partly from personal inspection of the entire locality made by the master. It appears that defendant's railroad was constructed there almost twenty years ago and the plaintiff's railroad about eight years ago. The grade crossing, as sought for and as now existing, occupies mainly the junction of Pike street with what was the River road, but said Pike street remains unopened and is only indicated on the topographical survey of the city.

" 4th. At the previous consideration of this case no evidence was submitted to your master touching that which is now made an important feature of the controversy, namely, the right of plaintiff company to cross or occupy the city streets in the territory covered by these branches. There is no testimony as to the consent or refusal of consent by city councils in the examiner's notes of testimony, laid before your master, and, therefore, the previous report is silent upon the subject. It was for that reason that your master declined to consider the legal side of the question, when requested by defendant's counsel to do so. The same counsel has now made the offer of testimony heretofore recited with plaintiffs' objections, which offer is de-

signed to formally introduce the question for adjudication. Whether this offer can be received now and by one whose office is only that of master, and whether it can properly be the basis of findings of fact or of a final decree, are serious points to be well considered hereafter. But inasmuch as the report is mainly referred back in this connection, and the court in its opinion of reference expressly points your master to the records of the interlocutory proceedings in this case, the master is justified in stating that he does find upon the records filed in this case an answer made by defendants to plaintiff's petition for leave to renew motion for injunction, etc., in which the defendants deny the right of plaintiff to construct these branches, and aver by way of reason that the consent of the councils of the city for plaintiff to occupy the said streets has not been obtained, but that on the contrary the said councils have expressly refused such privilege ; and further, that to this answer are annexed certified copies of the files of select and common councils, certified by the city clerk, manifesting the withholding of such leave. Whether any other proceedings were ever had in councils does not appear. Plaintiff company claims to have the necessary consent, but this is all your master has before him expressly relating to the subject.

"Having noticed so much of the record, it is but fair to heed the plaintiff's request, and to mention that, notwithstanding the answer thus made by defendants, the court, although refusing to award a preliminary injunction as prayed for, allowed the plaintiffs to construct a temporary crossing for construction purposes in building the said branches, thus recognizing the right to build the branches. This order has not been interfered with by the Supreme Court in the appeal taken thereto to No. 179 July Term, 1892 [151 Pa. 402]. The testimony before your master discloses that the plaintiff completely constructed these branches in the summer of 1891 at an expense of about $11,000, or a total, including the cost of crossing, of $11,247.50, and papers filed with the records of the case indicate an occasional use, under leave of the court, of the crossing and branches, for the transportation of the property of third parties.

" 5th. Defendants in their answer aver " that the grade crossing as proposed, will hinder and delay the defendants in their

movement of traffic and will work irreparable injury to them.' They do not aver, nor have they produced any testimony to show that any injury will result to them by reason of the occupancy by plaintiff of the city streets, nor do they show any complaint on the part of the officers of the commonwealth, the municipality, or the public."

The master's conclusions of law were as follows:

" The provisions of sections 10, 11 and 12 of the act of 1868 are in no way abridged or modified except by the act of June 19, 1871, P. L. 1361, § 2, which provides that 'if in the judgment of such court it is reasonably practicable to avoid a grade crossing they shall by their process prevent a crossing at grade:' Pittsburgh & Connellsville R. R. v. Southwest P. R. R., 77 Pa. 173.

" The substance of these provisions is thus condensed in article 17, section 1, of the constitution of Pennsylvania: 'Every railroad company shall have the right with its road to intersect, connect with, or cross any other railroad.'

" Thus is the right recognized for one railroad either to intersect, connect with, or cross another. The acts of assembly and the constitution expressly make it optional as to which shall be done, when the occasion arises for adopting one course or another: Northern Central R. Co.'s Ap., 103 Pa. 628."

After citing and quoting from Baltimore & Cumberland Valley R. R. Extension Co.'s Ap., 10 W. N. 530 ; P. R. R. Co.'s Ap., 116 Pa. 55; Moosic Mountain & C. R. R. Co.'s Ap., 13 Atl. R. 915; N. Cent. Ry. Co.'s Ap., 103 Pa. 621, the master continues:

" The Supreme Court has in Perry County R. R. Extension Co. v. Newport & Sherman's Valley R. R. Co., 150 Pa. 193, and in Pa. R. R. Co. v. Braddock Electric R. R. Co., 152 Pa. 116, pronounced that grade crossings are only to be allowed in cases of imperious necessity. Your master does not understand that the mere optional right of the plaintiff to connect with defendants' railroad has any bearing in determining the necessity for a grade crossing. If the plaintiff company has a right to build branches, it has the right to cross defendants' railroad in some manner in order to reach and operate them, and all that the act of June 19, 1871, prohibits is a grade crossing, if it is reasonably practicable to avoid it under all the facts

and circumstances as above outlined in accordance with the adjudications: Northern Central R. R. Co.'s Ap., 103 Pa. 628. The imperious necessity to cross at grade, which the courts have in contemplation, can have no greater significance than the reasonable practicability contemplated in the act, and construed by the same court. It is not claimed here that (as it appeared in the Perry County Railroad case, supra) the plaintiff company can adopt some other and more practicable route; nor can it be said of the case at hand that it is controlled by the ruling in Pa. R. R. Co. v. Braddock Electric Railroad Co., supra, which is expressly based upon the fact 'that a grade crossing at the place selected is so exceedingly dangerous that it should not be allowed, if there is any power in the court to prevent it,' and further upon the ground that 'all the environments of the crossing co-operate in making it exceedingly perilous,—so exceptionally dangerous, indeed, that it is surprising that the directors of the company are willing to imperil the lives and limbs of their patrons by attempting to cross at grade.'

"It therefore seems reasonable and proper to conclude that if the plaintiff in this case has a right to build and operate its branches as proposed, the right is established to cross defendants' railroad at grade, and that, as this proceeding is regarded as adequate, the decree as recommended should be adopted by the court.

"This brings us to an inquiry into plaintiff's right to construct the branches as set out in the bill. We have seen that section 9 of act of April 4, 1868, confers upon plaintiff company 'authority to construct such branches from its main line as it may deem necessary to increase its business and accommodate the trade and travel of the public,' and we have in evidence the resolution of the board of directors adopting the routes as laid out. That these are branches, and that the company has in general right to construct the same in the discretion of its president and directors, does not appear to admit of a doubt, in view of the evidence and the law: W. Pa. R. R. Co.'s Ap., 99 Pa. 155; McAboy's Ap., 107 Pa. 548. Even if they should properly be called 'sidings,' as claimed in defendants' answer, the same ruling will apply: Getz's Ap., 10 W. N. 453.

"This introduces us face to face with defendants' contention that the consent of the city to occupy the streets touched by

these branches was never obtained, and that therefore plaintiff
has no right to construct the same, and, in consequence, as the
crossing would serve no purpose, the right to construct it will
likewise fall.   A consideration of this proposition involves
amongst other points the following : (1) Is this issue raised
by the pleadings before us ?   (2) Is there any competent or con-
trolling testimony before your master on the subject ?   (3) Are
unopened streets, as well as opened streets, contemplated by the
act of April 4, 1868 ?   (4) Have defendants shown any stand-
ing or injury in this case which entitles them to interpose such
a ground against the grade crossing ?   (5) In view of all that
appears in this case, should it not be assumed that municipal
consent has been granted ?

" 1st. In paragraph two of plaintiff's bill it is alleged that
'they, under authority vested in them by law, have surveyed,
ascertained, located, fixed, and determined upon the routes for
two branch railroads,' etc.   To this part of the bill defendants
answer in their second paragraph that ' they have no knowl-
edge . . . . as to whether plaintiffs, under authority vested in
them by law, have surveyed, ascertained, located, fixed, marked,
and determined upon the route for a branch railroad,' and they
proceed to call upon plaintiff to make proof of these allega-
tions.   Manifestly this has nothing to do with the consent of
the city to occupy the streets, and nowhere else in the bill or
the answer does any matter appear pertinent to that subject.
It is true that the act of April 4, 1868, makes it the duty of
the railroad company to first obtain the consent of the city be-
fore it occupies its streets, but your master cannot believe that
in every proceeding seeking to have the manner of crossing an-
other regulated by the courts it is incumbent upon the plaintiff
company to show, as a condition precedent, that all its charter
restrictions affecting the right of third parties have been over-
come.   If such were the case, in every proceeding instituted
by the railroad company, the preliminaries to be established
would be more burdensome and voluminous than the main mat-
ters of the issue.   If such were the requirements, the railroad
at its very start must needs show that every right which will
be affected before the completion of its contemplated under-
takings has been acquired or quieted.   Had defendants even
demanded proof of plaintiffs' right to occupy the streets with

portions of their proposed branches, it is doubtful whether the law is so rigid as to exact a compliance with the demand. Certainly in the absence of such an issue in the pleadings, such a question must be foreign and irrelevant. [Plaintiff has proven all the allegations of the bill and all that defendants denied, and this should be sufficient.] [2]

"2d. In order to supplement the pleadings and to supply what defendants regard as an omission, they seek to introduce the subject by offering in evidence their answer made to a petition in this case for leave to renew motion for injunction, together with certified copies of ordinances of the city councils showing a refusal to consent to occupy these streets.

"It is proper at this juncture for your master to say that his appointment confers upon him none of the powers of examiner, and he therefore has no power to hear or receive testimony: Burton v. Peterson, 4 W. N. 526; Freeman v. Stine, 13 Phila. 28. Even an application to court for leave to present additional testimony would not be favored: Burton's Ap., 93 Pa. 214.

"Nor is the character of the evidence offered such as can be made the basis of a final decree. This is a mere answer in a preliminary or interlocutory proceeding, to which is appended a formal affidavit, together with copies of the records of councils certified by the city clerk. They are only ex parte in their character, and are not conclusive of the facts stated therein: Pittsburgh's Ap., 79 Pa. 317.

"Your master, however, is but the officer of the court, and as the learned president judge, in his opinion of reference, has regarded this evidence and has pointed the master's attention to it, it must be noticed for all it is worth, and the deduction therefrom plainly is that the action of councils under those ordinances was adverse to granting consent to plaintiff to occupy the said street with its branches, and that on July 6, 1891, plaintiff did not have such consent from the city of Reading.

"3d. Are unopened streets contemplated by the act of April 4, 1868? The only opened streets crossed by the branch in proceeding northward to the National Bolt, Nut and Rivet Works are Centre avenue and Exeter street. In proceeding southward to the Reading Foundry Company's establishment no opened street or highway is crossed. The old River road, by reason of its occupancy by both the plaintiff's and defendant's

roads, is no longer in existence at this point; and Pike street, which, at the point of this railroad crossing, on the maps of the topographical survey of the city, intersects the old River road, has never been opened. If it is unnecessary to obtain the consent of councils to cross or occupy the location of streets which have no actual existence but which are only in contemplation, it stands to reason that upon that ground this crossing cannot be objected to, because the tracks leading to the Foundry Company, to say nothing of other portions of the branches, will not interfere with the streets.

" The fact that the very crossing is located at the imaginary foot of Pike street or where it is designated by the topographical survey, approved by the court and filed amongst its records, to cross the old River road, obliges us to meet this question squarely, and to dispose of it pointedly and reasonably.

" In City of Chester v. Balt. & P. R. R. Co., 140 Pa. 275, the court appears to lay down the rule that a street so plotted and approved is to be regarded as an established street, but this case must not be construed beyond the issue involved in it. The railroad company there, as it is proposed here, constructed its tracks upon such a plotted street. Subsequently the street was actually opened, and the expense of making a crossing over the railroad being $176.26, this case arose upon the question as to whether the city of Chester or the railroad company should bear the expense. The courts put the expense upon the railroad company. This case, therefore, only declares that whatever expenses in opening these plotted streets may be incurred by the city hereafter, by reason of their occupancy now by plaintiff, must be borne by plaintiff, inasmuch as there is fair notice upon the records that the city has the prior right of occupancy. But although for such a purpose the city has a prior right of occupancy, it can hardly be said, with reason, to have an exclusive right of occupancy, so. as to demand that the railroad company shall obtain consent before crossing these designated locations. They may never be opened to public use: the public may never secure the right of passage over them to and fro; the land covered by them may, for an indefinite time, be the property of private individuals, so that no rights of the municipality or of the public will be infringed. It would seem unreasonable, therefore, that the legislature contemplated any such

construction of the charter rights of the plaintiff. On the other hand, in Com. v. P. & R. R. R. Co., 135 Pa. 256, Judge MITCH-ELL, speaking for the Supreme Court, very forcibly lays down the principle that 'the mere plotting of streets upon a city plan . . . . vests in the public no right to use them for travel; proceedings to open are necessary before they become actual streets, and the exclusive possession of landowners can be interfered with.' In that case an indictment was held not to lie for the obstruction of such unopened streets, and we apprehend that likewise in this case the plaintiff is not liable to be called to account for its action in the premises. If the plaintiff, therefore, has a right to build its branches across these unopened streets, and a right to occupy the foot of unopened Pike street for the purpose of extending its lines, what is there to prevent the crossing of defendants' tracks in some manner? [As we have determined that a grade crossing can properly be allowed in this case, the absence of municipal consent to occupy or cross these streets is therefore no barrier.] [3]

" 4th. Even were the foregoing propositions and conclusions unsound, what standing, in law or in fact, have the defendants to interpose the want of councilmanic leave? Your master understands defendants' contention to be, that, as the right to occupy streets only with the consent of the city first obtained is a charter restriction, any violation of this clause is ultra vires. But how can the defendants raise the cry of ultra vires? 'Excess in the exercise of power by a corporation is to be redressed by the commonwealth, and not by any and every volunteer who may choose to interfere:' R. R. Co. v. Allegheny Co., 63 Pa. 127; Goundie v. Northampton Water Co., 7 Pa. 233. It is a matter that is within the cognizance of the attorney general: Wright v. Pipe Line Co., 101 Pa. 208; Buck Mountain Coal Co. v. Lehigh Coal and Navigation Co., 50 Pa. 100. 'When equity intervenes to restrain acts prejudicial to the interests of the community, it must be by bill by the attorney general.' Sparhawk v. Union Pass. Ry. Co., 54 Pa. 401.

" We have already shown that plaintiff has an inherent right to cross defendants' tracks in some manner, and we have found that a grade crossing should be allowed in this case, and have therefore disposed of the only injury which defendants will suffer and of which they have complained in their answer, and the

only injury to which any of the testimony in·the case is related. There is no complaint in the bill and no evidence that any injury, aside from that which is incident to the mere crossing itself, will result to defendants either by the joint occupancy with defendants of the foot of unopened Pike street or by the occupancy of any of the other streets crossed by plaintiff's branches. In the absence of such a showing the defendants could not maintain a direct proceeding against the plaintiff for these acts. Much less can they be permitted to make this collateral attack : Sparhawk v. Union Pass. R. Co., 54 Pa. 401 ; Cleveland, P. & Ash. R. R. Co. v. City of Erie, 27 Pa. 380 ; Buck Mountain Coal Co. v. Lehigh Coal & Navigation Co., 50 Pa. 91.

" The public has no present rights in the unopened streets which the crossing and the branch to the Reading Foundry Company occupy. Consequently there is no offence against the public, and plaintiff is not guilty of maintaining a public nuisance in that behalf. In the absence of these elements and proof of special damages there can be no indictment or proceeding in behalf of public rights or to redress private wrongs : Black v. P. & R. R. R. Co., 58 Pa. 249 ; Cumberland Valley R. R. Co.'s Ap., 62 Pa. 218.

" It is true, the act of June 19, 1871, provides that the courts shall examine and inquire into the rights and franchises of corporations when it is alleged that they are injuring or invading the rights of individuals or other corporations, but this is no warrant for the inquiry here proposed, because no injury arising from the physical occupancy of these proposed streets is shown or claimed. In Larimer Ry. Co. v. R. R. Co., 137 Pa. 547, the Supreme Court has said : ' Although the unauthorized occupation of a public street by a railway track may be regarded as a nuisance per se, which will be enjoined, chancery will not restrain an act which affects the whole community, at the suit of a private citizen or corporation, unless the plaintiff can make out a case of special damage ; and it is difficult to see how the complainants may be said to have suffered special damages, when they have shown no right whatever to the occupancy of the street for the purpose of their incorporation.'

" The case of Germantown Ry. Co. v. Citizens' Ry. Co., 151 Pa. 141, in no way conflicts with the principles above laid down, because that case is expressly grounded upon the special injury,

inconvenience, and hindrance to plaintiffs in the operation of their road. In the case at hand it nowhere appears that the occupancy of the unopened or even opened streets will entail upon defendants injury, inconvenience, or hindrance.

"Your master recognizes the adage 'He who seeks equity must do equity,' and he is also aware that 'plaintiffs must come into court with clean hands;' nevertheless suitors are not to be turned away and denied their equities as against a defendant, simply because they have invaded or may invade the equities of third parties, or because they have befouled their hands in an unwarranted attack upon a stranger. Even the act of June 19, 1871, does not close the gates of justice thus upon corporation suitors, as section 1, page 1361, expressly requires that all complaints for injurious acts shall be at the suit of private parties or corporations injured, and the foregoing adjudications upon the subject should bring repose to the question.

"5th [Although express permission to occupy the streets in question has not been given to plaintiff company by the city, is there no warrant for assuming from all that appears in this case that plaintiff has tacit consent?] [4]

"The testimony establishes that the branches were in point of fact constructed in the summer of 1891 at the expense of over $11,000, and as the interlocutory proceedings in this case have been exposed to our view, it is there seen that an occasional leave has been granted by the court for the plaintiff to transport goods of third parties over the branches. All this has presumably been done in broad daylight and under the notice of the commonwealth and the municipality of the public. It has recently been decided that even to the commonwealth may laches be imputed: Com., etc., v. Bala and Bryn Mawr Turnpike Co., 153 Pa. 47.

"At least this much is certain, that no one other than the defendants has been so injured as to raise an objection to the location of these branches. All parties who are supposed to be more directly affected than defendants are silent, and are permitting this encroachment, if such it should be termed. Is this not equivalent to express consent, and if these parties thus manifest their consent, how dare defendants complain and invoke the rights of such parties in this collateral manner? It seems to us that nothing so exposes the weakness of defendants' contention as this."

Exceptions among others (1–4) to the findings as in brackets, and (6) in not recommending dismissal of bill, were dismissed, the following opinion being filed by ENDLICH, J. :

" This bill was brought for the purpose of establishing the plaintiff's right to, and fixing, a grade crossing over defendant's tracks, and restraining defendant from interfering therewith. As preliminary to a decree in such a proceeding the court, under act of June 19, 1871, P. L. 1361, may be called upon to determine two questions, (1) whether the local facts justify a grade crossing, and (2) whether the power to cross the track in question exists in the corporation attempting to do so. In this case, both of these questions are raised by the pleadings, and must be answered as raised. The first, a mere question of fact, is answered by the findings of the master, fully borne out by the evidence and therefore not to be disturbed. The second, the master's answer to which is entirely satisfactory to me, presents an inquiry which, to avoid unnecessary discussion, may be stated as whether, in this case, the absence of express antecedent assent by the municipal authorities of Reading to the construction upon one of its streets (assuming, but not conceding, an unopened street to be within the provision of the railroad act of 1868, section 12) of the plaintiff's railroad, is a bar to the entry of the decree recommended by the master.

I have had occasion, in several recent cases, to apply the elementary principle of chancery practice laid down by the highest authorities, founded in common sense and orderly practice, and recognized in the recent decision of Thompson's Ap., 126 Pa. 367, 371, that the only issues to be passed upon in a suit in equity are those made by the pleadings : See Garst v. Healy, C. P. Berks Co., No. 521 Eq. Dock. 1890 ; Krecker v. Shirey, C. P. Berks Co., No. 544 Eq. Dock. 1891. It cannot be pretended that the act of 1871, section 1, in saying that it shall be the duty of the court, in such a proceeding as this, to inquire into the power of a corporation to do the act complained of, meant to ignore or set aside this rule, and to make the question of the existence of such power an issue in every case, or an element in its decision, without or beyond any issue made by the pleadings concerning the same. A statute is not to be construed as intended to change the law beyond its immediate scope and purpose : Seiders v. Giles, 141 Pa. 93, 97. The leg-

islature is presumed to know the existing state of the law (Howard Assn's Ap., 70 Pa. 344, 346), which includes the whole system of pleading and practice (McDonegal v. Dougherty, 14 Ga. 674), and to intend its operation to be consistent with the same : Knox v. Hilty, 118 Pa. 430, 435.  It was no part of the object of the act of 1871 to prescribe or alter established rules of pleading or practice.  The rule referred to is older than the statute.  It must be supposed to have been within the contemplation of the legislature.  The duty imposed upon the court by it, in the act of 1871, can, therefore, arise only where and to the extent that the matter upon which the court is to pass is properly made an issue by the pleadings.  The latter, in this case, will be searched in vain for any reference to the assent or want of assent by the city councils to the construction of plaintiff's track as an element in determining its power to cross that of the defendant.  Plaintiff did not (as I shall show presently) need to aver the city's consent, and therefore cannot be supposed to have done so impliedly.  Defendant does not deny it. No issue is, therefore, made involving such an inquiry.  I agree with the master that it is not before the court, that no evidence upon it could be properly received or considered, and that it cannot enter into the decision of the case : See Thompson's Ap., ubi supra ; 1 Dan. Ch. Pr. 852–860 ; Foster, Eq. Pl. & Pr., § 67.  Its entire irrelevancy under the pleadings ought, in my opinion, to dispose of the argument founded upon it.  But, apart from this, I am satisfied there is nothing in it.

   " The act of June 19, 1871, P. L. 1361, provides that, 'in all proceedings in courts of law or equity of this commonwealth, in which it is alleged that the private rights of individuals, or the rights or franchises of other corporations are injured or invaded by any corporation claiming to have a right or franchise to do the act from which such injury results, it shall be the duty of the court in which such proceedings are had, to examine, inquire, and ascertain whether such corporation does in fact possess the right or franchise to do the act from which such alleged injury to private rights, or to the rights and franchises of other corporations results :' Sec. 1, 1 Purd. 357, pl. 108.  It is very clear from a mere reading of this enactment that the right of a private person or corporation to raise this inquiry extends only to the questioning of such acts as interfere with the rights or franchises of the

party raising it, and not to that of any exclusively affecting third parties or the public. If any authority is needed for so plain a proposition, it is found in West Pa. R. R. Co.'s Ap., 104 Pa. 399. The standing, then, of the defendant company to call upon the court, under the act of 1871, to inquire into the power of the plaintiff corporation to do that which it prays to be permitted to do here, must be given by the fact that that act will constitute an injury to the private rights of the defendant, not by the fact that it may involve danger to the public or wrong to the city of Reading. The threatened injury to the private rights of the defendant is that which is involved in the cutting and crossing of its tracks at grade. Now, it is a mistake to suppose that the legislative and judicial policy discouraging grade crossings springs from any exceptional regard for the property of the railroad companies. There is nothing peculiarly sacred about a railroad track as an article of property. On the contrary, railroads being public highways, are not even, for all purposes, to be treated as private property (P. & C. R. R. Co. v. S. W., etc., Co., 77 Pa. 173, 186), and it ought, by this time, to be understood, in Pennsylvania, that a railroad company, under the general railroad laws, takes the right to lay its tracks subject to the liability of having them crossed and intersected at grade by other railroads, having the power to cross tracks already laid, whenever there is a necessity therefor, so that no needless injury be inflicted and compensation be made for that which is done: See N. C. Ry. Co.'s Ap., 103 Pa. 621, 629. The discouragement of grade crossings, as a principle, arises from considerations beyond the interests of the railroad companies, viz., from considerations of public safety : P. & C. R. R. Co. v. S. W., etc., Co., ubi supra. For its preservation, the courts have adopted certain rules as to the allowance of grade crossings, and the legislature has confided to them authority over the subject which makes those rules enforceable, and has further enacted regulations controlling the action of railroad companies in laying tracks generally upon public streets. In appealing to the principles thus established, however, simply to prevent the crossing of their own tracks, railroad companies assert no private rights of their own, but stand upon ground common to the entire public ; and the necessity which satisfies the latter being shown as a matter of fact, their entire rights in the

premises are compensation and protection against needless injury. Granted that, in the assertion of these rights, they may raise the question submitted to the courts by the act of 1871 regarding the powers of the corporation which is the aggressor, it is nevertheless clear that that question, where a grade crossing is resisted, must primarily be, whether, regarded as an act affecting the objecting party's private rights, the power to do it does or does not exist. The question whether the act involves an infringement of a public right, or of a right to be exercised for the benefit of the public by the city or any third party, can, if it arises at all, arise only secondarily, as bearing upon the former and main question, as a makeweight in its decision.

"Obviously, the answer to the main question is to be sought for, in the first instance, in the charter of the corporation attempting to do the act resisted. 'The act of 1871 contemplates nothing more than that it shall be made to appear from the charter that the corporation has the power to do the particular act in controversy, and which involves some right of the contestant:' West Pa. R. R. Co.'s Ap., supra, pp. 406, 407. The act of 1868, which defines the powers exercisable by the plaintiff in this bill, gives, in sections 9 and 10, the power to construct branches and to cross the tracks of other railroads at grade. The findings and reasoning of the master demonstrate these powers to be here applicable, the question of streets being out of the way. Hence, if there were no such question here, and the local facts being, as I have said, found in favor of plaintiff, there would be an end of the objection of want of power, for the general power to cross tracks of other railroads with a road such as this is given to plaintiff by its charter.

"But here comes the auxiliary point. This crossing happens to cut a track located upon a public street, i. e., it happens itself to be located on a public street, and the grant in sections 9 and 10 of the general power to cross tracks must not, by reason of section 12, be construed as authorizing the occupation of streets without municipal consent. My answer is: The power to occupy streets is not the direct and primary question involved in this controversy. That question concerns the power to cross defendant's track. The effect of section 12, therefore, in considering this question, is to be judged by its relation, not to the power to occupy streets, but to the power to cross other

railroad tracks. Now, whatever may be its relation to the former power (see P. S. V. R. R. Co. v. P. & R. R. R. Co., C. P. Berks Co., No. 341 Eq. Dock. 1884 [affirmed above, p. 232] ), and though it be regarded as enacting a condition precedent to the exercise of that specific power (see Larimer Ry. Co. v. Ry. Co., 137 Pa. 533, 547), its relation to the general power to cross tracks of other railroads is simply that of an exception enacted subsequently to the explicit grant of that power. It is a familiar principle that, whilst he who relies upon a statute must show himself entitled under an exception made in the enacting clause, he need not, when relying upon a substantive grant by an earlier part of the statute, notice an exception made in a later part of it: See 1 Chitty Pl. (16 Am. ed.), 246, 247. Hence, in this case, it was not necessary for plaintiff to aver the consent of city councils in its bill, nor to prove it as part of its case. But neither could the defendant disprove it, because its injury does not arise from the act forbidden by the exception, but from one permitted by the preceding grant. The principle laid down in Larimer Ry. Co. v. Ry. Co., supra, is not to the contrary. All that is there decided, pertinent to this question, is that the court will not inquire into the authority for the occupation of a street by one company at the instance of another attempting without authority to occupy it—substantially what was decided by this court in P. S. V. R. R. Co. v. P. & R. R. R. Co., No. 500 Eq. Dock. 1890. Nor does the decision in Germ. Ry. v. Cit. Ry., 151 Pa. 138, aid the defendant here. The injury there complained of was that arising from an attempted construction of another railroad upon the same street, for the occupation of which by it there was alleged to be no charter authority, and the existence of this authority was the single question in the case. Here, the injury does not and cannot at all arise from an occupation of the street by plaintiff, but from its attempt to cross defendant's tracks. Upon what principle it can be claimed to be competent for the defendant to raise a collateral inquiry as to the power of plaintiff to do an act not directly the cause of its only possible injury, under a statute which merely permits it to call upon the court to pass upon the plaintiff's powers to do ' the act from which such injury results,' is beyond my comprehension. What was said by the Supreme Court in West. Pa. R.

R. Co.'s Ap., *ubi supra*, seems literally applicable here, substituting only the 'city of Reading,' for the 'Commonwealth.' 'When we go beyond this,'—i. e., the question whether the charter confers the power to do a specific act involving a right peculiar to the contestant—'we assume something with which we have no business in a collateral proceeding; we assume to assert the rights of a third party, the commonwealth, who may or may not, at her option, insist upon the observance of those rights.' It follows that sections 9 and 10, act 1868, are a complete answer to the only inquiry to which the court can possibly address itself in this case under the act of 1871.

"In the next place, even if it be conceded that the defendant is entitled to raise this question, and that the 9th and 10th sections of the act of 1868 are not a complete answer without a further showing of authority under the 12th, its contention here is in no better case. That the right to object to a railroad company's entry upon a street without the consent of the municipality resides primarily in the latter, will certainly not be denied, any more than that the right of a private party to raise the objection on the ground of specific injury to itself (see Larimer Ry. Co. v. Ry. Co., supra, p. 547) rests, where it exists at all, upon the principle that one of a number in interest may assert, for his benefit, a right of another, which it is the latter's duty to assert for the benefit of all—the same principle, which, e. g., permits a stockholder in a corporation to proceed against persons wrongfully dealing with the corporate property, where the corporation itself neglects to do so: See 3 Pom. Eq. Jur., secs. 1094–5; 1 Moraw. Pr. Corp., sec. 257; Brown v. Orr, 112 Pa. 233. I do not say that it was the duty of the city to resist the plaintiff's entry upon this street, and therefore do not admit the right of the defendant to oppose it for the benefit of the public. The case might be different if a railroad company attempted to occupy one of the main thoroughfares of a city without municipal consent. But there is no analogy between such a case and that of a street unopened and unlikely ever to be opened. Concerning the latter, it cannot be for the court to say collaterally that it is the duty of councils to resist, and that, if they fail to do so, any private person, however trifling his interest, may. But supposing that defendant had a standing to assert the right of the city, it is clear that it could assert the

same only in so far as and while it existed in the city. When the latter has lost or parted with the right, it no longer exists anywhere, and of course cannot be set up by the defendant. Now, though the obtaining of the city's consent to occupy any of its streets be a condition precedent to the lawful exercise of the power to do so by a railroad company, it cannot be pretended that, where the power has been exercised without previous consent, the act cannot be subsequently ratified and legalized by the city. Nor is there any method prescribed by which alone consent can be given by the city, antecedently or subsequently. I agree with the master entirely that the facts of this case establish, in equity, a subsequent ratification by the city of plaintiff's entry upon its streets for the purpose of constructing the track here in question, by virtue of which, under the principle of Com. v. Turnp. Co., 153 Pa. 47, and a multitude of other decisions, it has divested itself of the right to raise the objection of want of antecedent municipal authority. Of course, the defendant's right in raising this objection can rise no higher than those of the city to which it primarily belongs, but falls with them."

*Errors assigned* were (1–4, 6) dismissal of exceptions; (5) portion of decree quoted in opinion of Supreme Court; (7) in not dismissing plaintiff's bill; quoting exceptions and decree.

*Jefferson Snyder, Geo. F. Baer* and *Philip S. Zieber* with him, for appellants, cited: D. & H. Canal Co. v. Pa. Coal Co., 21 Pa. 131; Horton's Ap., 13 Pa. 67; Cumberland V. R. R. Co.'s Ap. 62 Pa. 230; Pa. Sch. V. R. R. v. P. & R. R. R., 7 Pa. C. C. R. 490; Perry Co. R. R. v. R. R., 150 Pa. 199; 2 Dan. Ch. Pl. & Pr. (Perkins's ed.) 834; Story's Eq. Pl., 8th ed. § 868; Warfield v. Gambrill, 1 Gill & Johnson, 503; Brown v. Pierce, 7 Wall. 211; Larimer Ry. v. Ry., 137 Pa. 547; Act of April 26, 1864, P. L. 601; Chester v. Balt. & P. R. R., 140 Pa. 275; Com. v. P. & R. R. R., 135 Pa. 256; Com. v. Bala & Bryn Mawr Turnpike Co., 153 Pa. 47; Pa. R. R. Co.'s Ap., 115 Pa. 514; Germantown Pass. Ry. Co. v. Citizens' Ry., 151 Pa. 138.

*Cyrus G. Derr*, for appellees, cited: Northern Cent. Ry. Co.'s Ap., 103 Pa. 621; Act of June 19, 1871, P. L. 1361, Purd. 357;

Act of April 4, 1868, P. L. 62, Purd. 1416 ; Com. v. P. & R. R. R., 135 Pa. 256 ; Com. v. Bala & Bryn Mawr Turnpike Co., 153 Pa. 47.

PER CURIAM, March 12, 1894 :

It is unnecessary to refer in detail to the facts of this case. They are fully set forth in the reports of the master and opinion of the court below. The purposes of the bill were to determine plaintiff company's right to a grade crossing over defendant company's tracks and to regulate the exercise of that right, and, in the meantime, to restrain defendant from interfering with the construction of said crossing. The questions involved depended largely on facts and circumstances which to some extent are peculiar to the case ; and they appear to have received the careful consideration of both the learned master and the court below. The first four and sixth specifications, respectively, charge error in not sustaining exceptions to the master's report and supplemental report. The remaining specifications complain of (1), the following portion of clause " first " of the decree : " That the crossing now constructed at grade, as indicated by the draft submitted, filed with and attached to the master's report, remain free from defendant's interference for the use and purposes of the plaintiff," and (2), the refusal of the court to dismiss the bill. The residue of the decree, providing for the maintenance of said crossing, regulating the time and manner of using the same, etc., is not the subject of complaint, except in so far as it may be embraced in the general assignment of error to the refusal of the court to dismiss the bill.

An examination of the record, with special reference to the several questions involved in the specifications above referred to, has failed to convince us that either of said exceptions to the master's report should have been sustained, or that there is any error in that portion of the decree above quoted. Further discussion of the questions so fully and carefully considered and disposed of by the learned judge of the common pleas would serve no useful purpose. The facts found by the master and approved by the court are sufficient to sustain the decree. We find nothing in the record that requires its reversal.

Decree affirmed and appeal dismissed, with costs to be paid by appellant.